IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-03247-MEH

CARMAN GENNARO,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

## ORDER

**Michael E. Hegarty, United States Magistrate Judge**

      Plaintiff, Carman Gennaro, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **AFFIRMS** the Commissioner's final order.

## I. STATEMENT OF THE CASE

      Plaintiff seeks judicial review of the Commissioner's decision denying his application for disability insurance benefits filed on December 9, 2010.  [Administrative Record ("AR") 264-266]  After the application was initially denied on March 31, 2011 [AR 199-201], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for July 25, 2012 [AR 232-236];

Plaintiff and a vocational expert gave testimony at the hearing.  [AR 38-84]  The ALJ issued a written ruling on August 10, 2012, in which the ALJ denied Plaintiff's application stating he was not disabled since December 11, 2009, because the Plaintiff did not have a severe impairment equaling those listed in the applicable federal regulations (Step 3); he had the residual functional capacity ("RFC") to perform work with some limitation on exertional levels and some limitation on non-exertional levels (Step 4); and considering Plaintiff's age, education, work experience and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform (Step 5).  [AR 20-34]

On September 27, 2013, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.  [AR 1-4]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed his complaint with this Court seeking review of the Commissioner's final decision.

## II. BACKGROUND

Plaintiff was born on December 27, 1962; he was 47 years old when he filed his application for disability income benefits on December 9, 2010.  [AR 302-308]  Plaintiff claims his disability began on December 11, 2009, and he was not disabled prior to the age of 22.  [*Id.*]  For the present application, Plaintiff reported that he was limited in his ability to work by a ruptured disc in his neck; Type 2 Diabetes; heart disease; and depression.  [AR 303]  Plaintiff claims that his last day of work was December 11, 2009 because he "was fired from this employer."  [*Id.*]  Plaintiff reported that his ability to work is limited because it "causes pain in neck, memory loss (at times), trouble sleeping, mood swings, sometimes vision blur[ry], need to use bathroom many times & meds cause

diarrhea." [AR 311]  Plaintiff states that he took Fluoxetine for depression and an "unknown" medicine that caused diarrhea as a side effect.  [AR 318]

Plaintiff's work history included "auto parts installer" from 1987-1994; "sand blaster" from 1994-1999; "lumbar warehouse and sales" from 1999-2001; "tire and lube tech" in 2002; "elec sales security coordinator" from 2002-2004; an "emissions testing lane inspector" from 2004-2006; and a "P.S.M at AutoZone" from May 2006 to Dec 2009.  [AR 320]  His earnings in 1987 through 2007 varied between $5,649.52 to $27,656.84; in 2008 were $23,098.72; and in 2009 were $23,990.55. [AR 281-282]  There is no income listed for the years 2010-2012.  [*Id.*]

Plaintiff claims that he was seen at the Veterans Administration Medical Center ("VA") for treatment of his disabling conditions. [AR 306] The first medical record Plaintiff submitted supporting his application is from January 5, 2009, which indicates that Plaintiff had been prescribed Atenolol and Lisinopril for blood pressure, Glyburide and Metformin for diabetes, Fenofibrate (unknown), and Niacin for lowering cholesterol [AR 412-414] Plaintiff reported that he "has been feeling good" and "has been compliant with med[ication]s." [AR 413] After examination, the physician noted that Plaintiff's hypertension and diabetes were "well-controlled," but his "triglycerides [were] remarkably high," so advised the Plaintiff to repeat a "lipids" test after fasting. [AR 413-414]  However, the Plaintiff "did not show" for the scheduled lipid clinic appointment on March 5, 2009. [AR 411-412]

The next record, from October 20, 2009, indicates that Plaintiff reported he "feels very well today," his diabetes mellitus and hypertension were "well-controlled," but his triglycerides were "remarkably high," so again the physician advised the Plaintiff to fast before attending the lipids

clinic for a blood draw. [AR 406-409] Notably, for the "depression screen," Plaintiff responded to the questions, "little interest or pleasure in doing things" and "feeling down, depressed or hopeless" with the term, "not at all." [AR 410] The physician also noted Plaintiff's body mass index at 35.7 and advised Plaintiff of the benefits of a weight management program offered at the VA; Plaintiff declined. [AR 411]

Although the records indicate Plaintiff had a followup appointment for January 26, 2010 [AR [AR 403], the next record indicates Plaintiff came in for a follow-up appointment on March 2, 2010. Plaintiff reported he "has been laid off from work lately" and "has actually been feeling great in terms of his health lately" but "would like to discuss how he can cut down on his meds to save money." [AR 398] The physician noted that Plaintiff had been taking his medication for diabetes every day and found that his hypertension was "well controlled," but noted "remarkably high" trigylerides again where the Plaintiff did not fast. [AR 399] She referred Plaintiff again to the lipid clinic. [*Id.*]

Plaintiff attended the lipid clinic on August 4, 2010; the pharmacist noted that, since Plaintiff's trigylerides were lower despite reduction in medication, the improvement was due to dietary changes and she would "try Niacin monotherapy" and "discontinue Fenofibrate." [AR 392] Plaintiff next called the VA on August 10, 2010 to inquire whether he could see a physician sooner than his next scheduled date in October to complete social security disability "paperwork." [AR 387] He was advised that he needed to bring the paperwork to the doctor. [*Id.*] Plaintiff did not "show" for the next scheduled appointment with the lipid clinic on September 22, 2010. [AR 386]

On November 16, 2010, Plaintiff saw Christopher King, M.D. for a "follow-up" appointment

4

at which he first mentions a "ruptured disk" in his neck at C4-5 which causes headaches a couple of times per day. [AR 471-476] Plaintiff reported that the pain was not severe, but it bothered him and likely caused depression. [AR 473] He also told the doctor that he had been laid off from work and was unable to find a job, so "should be on disability." [*Id.*] Dr. King disagreed with Plaintiff saying, "Pt does not have a reason to be on disability; he is actively trying to get a job and I encouraged him in this." [AR 475] The doctor did, however, determine Plaintiff to be depressed and prescribed an "SSRI." [*Id.*] Dr. King also noted that, although Plaintiff's body mass index had risen to 36.1, Plaintiff declined exercise and nutrition counseling. [AR 476]

Plaintiff filed the present application for disability benefits on December 9, 2010 [AR 264-271] claiming the following conditions limited his ability to work since December 2009: ruptured disk in neck; Type II Diabetes; heart disease; and depression. [AR 303] Thereafter, on January 11, 2011, Plaintiff called the VA to report that his anti-depressant was causing sleepiness and more neck pain and to ask for a call back by the doctor; Dr. King returned Plaintiff's call and advised him to stop the SSRI and to follow up with the doctor in February. [AR 469-470]

Meanwhile, on January 13, 2011, the Plaintiff completed several questionnaires for the SSA, including a Function Report in which the Plaintiff reported that he could perform some house and yard work on a daily basis; laundry; prepare meals (unless he did not want to); spend time with his pets; handle his finances; spend time with others on the phone or computer on a daily basis; drive; ride a motorcycle; walk for 30 minutes before needing a rest; handle stress well, but not changes in routine; and get along with authority figures and his family, unless mood swings made it difficult. [AR 311-318] Plaintiff claimed that his neck pain was mostly a mild ache every day, but sharp at

times and never stopped. [AR 319]

Following the filing of his present application, Plaintiff was referred to Frank J. Wright, M.D. for a consultative physical/psychological examination on March 16, 2011.  [AR 416]  Dr. Wright noted that he "believe[d] this claimant was being truthful and the exam was performed with full cooperation." [AR 418]  Plaintiff reported to Dr. Wright that his neck injury occurred 15 years previously in a motor vehicle accident, he has had MRIs and CT scans and one cortisone shot, and gets headaches from the neck injury 3-4 times per month. [AR 416] He also told the doctor that he has no problems with his feet, eyes or kidneys from his diabetes and his heart disease "consists only of hypertension for which he takes medications." [*Id.*] Plaintiff claimed that he "cannot work now because [the pain] is very tiring and he has very limited energy." [AR 417] He also asserted that he could sit for two hours, stand for 30 minutes and walk for 20-30 minutes, and conceded that his medications help him. [*Id.*] After a full physical examination, Dr. Wright found Plaintiff's functioning to be "fair" and his findings matched Plaintiff's stated limitations; accordingly, Dr. Wright determined Plaintiff could do the following in an 8-hour day: sit for four hours, up to an hour at a time; stand and walk for four hours, up to a half hour at a time; bend no more than three times in an hour; lift 20 pounds; carry 10 pounds; converse, travel independently, and perform daily activities and repetitive motions; but could neither squat nor crawl. [AR 420] In addition, Dr. Wright ordered an x-ray of Plaintiff's cervical spine; the radiologist found "moderately severe cervical spondylosis." [AR 415]

The following week, George Hearne from the SSA Disability Determination Services called the Plaintiff to inquire about the "severity of [his] depression." [AR 332] Plaintiff reported that his

depression was "due to physical conditions and not overly severe"; Mr. Hearne noted the Plaintiff "does not feel that a psych CE is needed and thinks that his physical conditions are his main problems." [*Id.*]

On March 31, 2011, the SSA sent to Plaintiff a Notice of Disapproved Claim stating "[w]e have determined that your condition is not expected to remain severe enough for 12 months in a row to keep you from working." [AR 199] The notice informed Plaintiff that, if he disagreed with the decision, he had a right to request a hearing within 60 days after receiving the notice. [ AR 200] Thus, on April 20, 2011, Plaintiff completed an Appointment of Representative form with the DDS which identified Sasha Kurbegov as his attorney [AR 197], and on May 5, 2011, he completed a Request for Hearing by Administrative Law Judge form [AR 202].

On May 18, 2011, the Office of Disability Adjudication and Review (ODAR) sent Mr. Kurbegov a letter confirming receipt of the request for hearing, informing Plaintiff of hearing procedures and explaining that a Notice of Hearing will be sent at least 20 days before the hearing notifying him of the time and place. [AR 204-205]

Meanwhile, on June 7, 2011, Plaintiff visited Dr. King at the VA for a "follow up." [AR 465-468] Plaintiff reported that he had been "having good control of his [diabetes mellitus]," he stopped taking his SSRI "as it made him very sleepy," and he had "no change in his chronic neck pain and has continued to do some exercises taught to him in PT." [AR 466] Dr. King determined to try a different SSRI to "help with fatigue and neck pain"; continue with same physical therapy and over-the-counter medications for neck; and continue all other medications. [AR 467] Thereafter, Dr. King attempted to call Plaintiff regarding a medication change in July and August 2011, but his phone was

7

disconnected and/or Plaintiff did not answer. [AR 468]

On October 11, 2011, Plaintiff presented for "continued care" with Dr. King; he reported having chest pain (for three months), back pain, and shoulder pain but no shortness of breath, and still feels tired. [AR 454] Dr. King found "no evidence of cardiac or pulmonary issues," Plaintiff's diabetes medication would remain the same but Plaintiff needed to watch his diet and exercise, his hypertension was "well-controlled," his LDL was "at goal," and there was a need to increase the SSRI dosage for Plaintiff's depression. [AR 456]

Plaintiff next presented to Dr. King on January 10, 2012 for continued care; he reported his chest pain was unchanged, his left knee "continued to cause him pain" since an injury months ago, he suffered from "scalp lesions," and his C-spine pain continued so he requested an MRI. [AR 448-449] Dr. King noted the chest pain was not cardiac-related and that Plaintiff had not followed pain regimen (NSAIDs) prescribed at the last visit. [AR 450] The doctor also ordered an MRI for Plaintiff's neck and noted the diabetes test was "at goal," the hypertension was "well-controlled" and Plaintiff had not improved with his depression medication, but he did not want to increase it. [*Id.*]  The x-ray of Plaintiff's knee was "normal." [AR 447]

Plaintiff returned a week later complaining that he had not received the medication for his scalp lesions, that his left knee still hurt, and that the SSRI had made him "lethargic" and he wanted to be taken off of it. [AR 446] Jennifer Poole, M.D. diagnosed "pre-patellar bursitis" and prescribed NSAIDs for the pain and gave Plaintiff instructions for weaning off the SSRI. [AR 447] On January 24, 2012, Dr. King called the Plaintiff "reinforcing taking NSAIDs for knee pain" and letting him know the doctor completed paperwork regarding Plaintiff's restrictions in walking and lifting for

8

the Arapahoe Workforce. [AR 441]

Plaintiff presented to Glenn Woning II, M.D. on February 29, 2012 complaining of continued knee pain and reporting that he does not want to take the NSAIDs as it only masks his pain and he wants to get to the underlying problem; Plaintiff also asked that paperwork be completed for limiting his activity for work that is required to obtain food stamps. [AR 433-434] The doctor diagnosed pre-patellar bursitis and explained that NSAIDs are necessary to reduce inflammation; if no improvement then would consider steroid injection. [AR 434]

On March 2, 2012, Dr. King addressed a letter to Plaintiff regarding the results of his MRI on his neck; the doctor noted, "There is nothing that would urgently need attention at this time. Physical therapy would be an option to help with your pain[;] I would be happy to talk with you about this at our next visit." [AR 431]

On May 2, 2012, Plaintiff completed an Appointment of Representative form identifying Joseph Whitcomb of the Rocky Mountain Disability Group as his new counsel. [AR 223] The McDivitt Law Firm withdrew its representation of the Plaintiff on May 7, 2012. [AR 226]

On May 15, 2012, Plaintiff presented to Dr. King for continued care. [AR 428-430] Plaintiff complained that his knee still hurt but the swelling had subsided with taking ibuprofen, and he noticed some lack of feeling in his feet and fingers. [*Id.*] Dr. King noted Plaintiff's medication had controlled his diabetes; there was no foot disease; he would start Plaintiff on Gabapentin for knee pain; Plaintiff's hypertension was "well-controlled"; and Plaintiff would try non-pharmocological methods for relieving depression. [*Id.*] Another record indicates the VA Mental Health Clinic staff addressed a letter to the Plaintiff on May 15, 2012 saying they attempted to reach Plaintiff by

telephone (but were unsuccessful) to evaluate his need for mental health services. [AR 515] On May 29, 2012, Dr. King addressed a letter to Plaintiff informing him that his test results for diabetes hemoglobin A1C was too high and that he would refer Plaintiff to the pharmacy for further treatment and management. [AR 511]

Plaintiff presented to the VA Emergency Department on June 8, 2012 complaining of swollen feet, likely from a new medication, Neurontin. [AR 504] The physician noted that "edema is a known side effect of Neurontin"; accordingly, the doctor discontinued the medication and referred Plaintiff to Podiatry for a foot nodule. [AR 506] The Plaintiff informed the VA on June 12, 2012 that the swelling had subsided after he stopped the Neurontin [AR 503], but called again on June 19, 2012 saying that the swelling had returned [AR 501].

The following week, Plaintiff saw Joseph Keach, M.D. at the VA on June 26, 2012 for evaluation of his knee pain, feet swelling and nodules on both feet. [AR 499] Dr. Keach determined to "monitor" the swelling and ordered compression socks for the Plaintiff; he also advised Plaintiff to stretch and exercise his knee and referred Plaintiff to Podiatry for foot nodules. [AR 500] The Plaintiff visited Dr. King the next week, on July 2, 2012, for continued care. [AR 494] Plaintiff reported some continued swelling and stated he "still wants his disability paperwork filled out." Dr. King noted that Plaintiff had not been taking his diabetes medications regularly but would do so in the future; that Plaintiff's hypertension was "over controlled"; that Plaintiff's neck pain was unchanged and he was "working to get disability" for it, but Dr. King stated that he could not comment because he did not have the testing equipment necessary; and that Plaintiff's LDL was controlled. [AR 496]

10

Meanwhile, on June 20, 2012, the ODAR sent Plaintiff a Notice of Hearing informing the Plaintiff that the hearing would occur on July 25, 2012 in Denver, Colorado.  [AR 232-236]  The notice contained forms for the Plaintiff to complete, including an acknowledgment of receipt of the notice, recent medical treatment, medications and work history. [AR 237-255] Plaintiff signed an acknowledgment of receipt of the notice on June 30, 2012. [AR 257]

On July 11, 2012, the ODAR sent to Plaintiff and his counsel an "Important Reminder" of the hearing scheduled for July 25, 2012.  [AR 258-259]  The day of the hearing, Plaintiff and his counsel appeared and William Tisdale appeared as a vocational expert.  [AR 38]  Plaintiff testified that he completed the twelfth grade in school; described his past work as a sandblaster, anode maker, warehouse order taker, lumber warehouse customer service, security coordinator, emissions lane inspector, and parts service manager; he was fired from his last job for alleged failure to follow procedure resulting in customer theft; he received unemployment benefits for nearly two years for which he indicated he was ready, willing and able to work; completed seven applications per week while looking for work; the medications he was currently taking "helped"; he brought a cane to the hearing because his knee was "a little sore"; started using the cane months previously when he injured his knee; at his last job, he took naps and needed to use the bathroom more often due to diabetes; after termination, looked for the same type of jobs he had done in the past; the majority of his pain is in his neck and shoulders; has trouble lifting and bending over; still has headaches one to two times per day which reach a 3 on a scale of 1-10; while Dr. King referred him for mental health therapy he had not "gotten any response back yet"; he had a high threshhold for pain; he believes he was terminated in part due to his injuries; he rarely socialized and spent most of his time

11

at home due to low energy; he took one dose daily of over-the-counter medication for neck pain; he would not be able to assemble parts at a workbench for two hours due to neck pain; he can only sit bent over working on something for 15-20 minutes at a time; can stand for 45 minutes at a time due to lower back pain; he can sit looking at a computer screen for "quite awhile," 45-60 minutes at a time; he can walk for 30 minutes due to lower back pain; rests once or twice per day for 20-30 minutes for headaches; he meets people at restaurants, but rarely invites people to his house because of difficulty keeping it clean; once a month, he spends most of the day in bed due to depression; diabetes limits his ability to work in rare blurry vision and medications cause diarrhea; he works in his vegetable garden 1-2 hours per week; drove his motorcycle three times per week up to 30 minutes per instance; spent 5-6 hours per day on the computer but not all at one time; went to the grocery store twice a month; and could lift 25 pounds once every hour.  [AR 43-76]

After listing the skill and exertional levels for Plaintiff's past work, the vocational expert, Mr. Tisdale, then testified that a hypothetical employee – same age and educational background as the Plaintiff; who cannot climb scaffolds or ladders, but can lift and carry up to 20 pounds occasionally and 10 pounds frequently, can sit at least an hour at a time for six hours during the day, can stand or walk at least an hour at a time for six hours during the day, and can occasionally stoop, kneel and crouch – could perform the Plaintiff's past work as a parts salesperson, lane inspector and sandblaster. [AR 77-79]  However, if the limitations of carrying were changed to 10 pounds, sitting were changed to an hour at a time for four hours, and standing and walking were changed to 30 minutes at a time for four hours, the individual could still perform the parts salesperson and lane inspector positions, but could not perform the sandblaster position. [AR 79] If the limitations were

further changed to the individual needs to have the option to relax for five minutes every 30 minutes throughout the day, the Plaintiff could perform no competitive work. [AR 80] When asked if the hypothetical employee were limited to bending at the waist no more than three times per hour, Mr. Tisdale testified such limitation would preclude parts salesperson and lane inspector, but the individual could perform the jobs of food and beverage order clerk, call-out operator and charge account clerk, with the option to sit and stand. [AR 81-82]

A medical record from July 27, 2012 indicates that the VA Endocrine Service recommended Plaintiff self-monitor his blood glucose level, participate in medical nutrition therapy, and start basal insulin to improve glycemic control for Plaintiff's diabetes. [AR 490-491]

On August 10, 2012, the ALJ issued an unfavorable decision finding the Plaintiff not disabled since December 2009, determining that Plaintiff had been engaged in no substantial gainful activity since the onset date; he suffered severe impairments of diabetes, neck and shoulder pain/moderately severe cervical spondylosis, and obesity, none of which met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; and Plaintiff had a residual functional capacity that allowed him to perform jobs that exist in significant numbers in the national economy. [AR 23-34] Plaintiff requested review of the decision by the Social Security Appeals Council on August 23, 2012. [AR 18-19]

Meanwhile, the Plaintiff presented to the VA for a Diabetic Teleretinal Imaging for Diabetic Retinopathy on August 14, 2012. [AR 544-546] The exam results were normal. [AR 538] That same day, Plaintiff visited a Clinical Pharmacy Specialist for diabetes management; the clinician noted that Plaintiff had significant difficulty with adhering to his medication regimen due to memory loss

from stress associated with his brother's death the previous year and due to financial issues. [AR 547] Plaintiff conceded that he did not always follow a diabetic diet and he did not wish to start any new medications, including insulin, but would if he had to. [*Id.*] The clinician noted that Plaintiff's diabetes was uncontrolled due to inconsistencies in taking medication and staying on a diet; he encouraged Plaintiff to adhere to medication regimen and diet and deferred medication changes until lab results received. [AR 549-550] Two days later, the clinician telephoned the Plaintiff with the lab results; they were improved from May, so the clinician increased only the Plaintiff's over-the-counter medication; Plaintiff declined any further change in his medication regimen. [AR 550-551]

Plaintiff presented to the VA Podiatry department on August 28, 2012 for a "diabetic foot check." [AR 541-543] Plaintiff reported that a nodule on his foot "was no longer present" and denied any other concerns. [AR 541] After examination, the physician "educated patient on proper foot care," ordered compression stockings, and advised Plaintiff to return in six months for continued care. [AR 543] Plaintiff went back to the VA on September 10, 2012 complaining of pain from the stockings; the physician noted that the stockings were snug in the same place as Plaintiff's injury to his knee and advised Plaintiff to wear them only 2-3 hours at a time. [AR 535-537] At a follow-up on September 25, 2012, the physician noted Plaintiff's knee pain was exacerbated by the compression stockings and referred him for a physical therapy consultation. [AR 532-534]

On October 15, 2012, Plaintiff saw his new primary care physician, Allan Prochazka, M.D. to whom Plaintiff complained about the knee pain, fatigue and the bump on his left foot. [AR 529-530] Dr. Prochazka noted Plaintiff's diabetes was under "control," his blood pressure was "at target," and his lipids were "improved with fasting," and ordered a physical therapy consultation for

14

Plaintiff's knee and a pulmonary consultation for Plaintiff's sleepiness/fatigue. [AR 531] Plaintiff reported to the pulmonary clinic on November 5, 2012; the physician suspected "sleep disordered breathing" and counseled Plaintiff to lose weight, stop caffeine six hours before bed, and turn off the television in the bedroom. [AR 521-524]

Plaintiff next saw Dr. Prochazka on February 11, 2013; the doctor noted Plaintiff's blood pressure was "at target," that his diabetes medications may need to be adjusted, that neuropathy in the feet was in question, and that he would monitor a nodule on Plaintiff's foot. [AR 172-175] On February 25, 2013, Dr. Prochazka addressed a letter to Plaintiff regarding his lab results saying his blood sugar was elevated and referring the Plaintiff to a Diabetes Educator. [AR 168-169] Plaintiff saw the Diabetes Educator on April 15, 2013; the nurse noted that Plaintiff "lacks knowledge and skills [in] diabetes self-management." [AR 126] The nurse educated Plaintiff on the disease and necessary diet, exercise and medication regimen. [AR 127] Plaintiff also saw Dr. Prochazka the same day and agreed to try medication change for diabetes, including insulin, and weight reduction program. [AR 128-130] However, on May 15, 2013, the day he was to attend orientation for the weight program, Plaintiff called and canceled saying that he "wasn't getting the service he expected," and declined to reschedule. [AR 124]

At his May 17, 2013 diabetes management appointment, Plaintiff reported that his neck and knee pain limit his ability to exercise and he canceled the weight reduction program because he did not have the finances to travel to the program. [AR 121] The nurse educated Plaintiff about his diet, exercise and stress. [AR 122] Plaintiff returned the following month, on June 17, 2013, reporting frustration that his blood sugars were the same with increased exercise and better diet and that his

sleep study did not work out. [AR 114] The nurse encouraged Plaintiff to start insulin; Plaintiff agreed to discuss it with Dr. Prochazka. [AR 115-116] That same day, Plaintiff reported to Pulmonology to schedule another sleep study. [AR 116-119]

On June 26, 2013, Plaintiff presented to the VA first to a doctor, then to a nurse for instructions on insulin injections. [AR 109-112] He reported to the physician that he was diagnosed by Pulmonology with reactive airway disease and prescribed Symbicort with which he had improved. [*Id.*] The physician noted that, while Plaintiff's diabetes was "uncontrolled," his hypertension was "under good control." [AR 112] Plaintiff followed up with the VA on July 11, 2013 reporting that he had used the insulin as instructed every day. [AR 105-108] The physician referred Plaintiff to the Diabetes Educator for an appointment on July 29, 2013 and to nutrition education on August 21, 2013. [AR 108]

On September 27, 2013, the Appeals Council "found no reason under our rules to review the Administrative Law Judge's decision," and denied the Plaintiff's request for review. [AR 11-32]

### III. LAW

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements. *See* 42 U.S.C. § 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of

the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, he is not presumed to be conclusively disabled. Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past. If the claimant is able to perform his previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. § 404.1520(g).

## IV. ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since December 11, 2009, the alleged onset date (Step One).  [AR 25]  The ALJ further determined that Plaintiff had the following severe impairments: (1) diabetes; (2) neck and shoulder pain/moderately severe cervical spondylosis; and (3) obesity (20 C.F.R. § 404.1520(c)) (Step Two).  [*Id.*] The ALJ specifically found that Plaintiff's depression was not severe because it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." [AR 25-26] The ALJ also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (Step Three).  [AR 26-27]

The ALJ then determined that Plaintiff had the RFC to perform "a range of light work as defined in 20 CFR 404.1567(b) with the following limitations: the claimant must avoid climbing ladders and scaffolding; the claimant can lift and carry 10 pounds frequently and 20 pounds occasionally; the claimant is able to sit for at least one hour at a time and up to four hours during an eight-hour workday; the claimant can stand for at least 30 minutes at a time and up to four hours during an eight-hour workday; the claimant can walk for at least 30 minutes at a time and up to four hours during an eight-hour workday; and the claimant can occasionally stoop, kneel and crouch." [AR 27]  The ALJ found Plaintiff's statements regarding the intensity, persistence and limiting effects of his physical symptoms not credible to the extent they were inconsistent with the RFC assessment; the objective medical evidence and exam findings are inconsistent with Plaintiff's statements regarding his physical health; and Plaintiff's allegations of disabling mental symptoms

18

are inconsistent with the record.  [AR 20-25]

The ALJ next ruled that Plaintiff was capable of performing two positions from his past relevant work (Step Four) and, alternatively, determined that considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform work existing in significant numbers in the national economy (Step Five).  [AR 32-34]  As a result, the ALJ concluded that Plaintiff was not disabled at Steps Four and Five of the sequential process and, therefore, was not under a disability as defined by the SSA.  [AR 34]

Plaintiff sought review of the ALJ's decision by the Appeals Council; however, the Council determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 1]

## V. STANDARD OF REVIEW

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor

substitute its judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991) (citing *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI. ISSUES ON APPEAL

On appeal, Plaintiff raises three issues: (1) the ALJ "discriminately accepted only the evidence least favorable to Mr. Gennaro"; (2) the ALJ "did not sufficiently consider depression, pain, the side effects of Mr. Gennaro's diabetes treatment, or obesity"; and (3) the "ALJ's determination that Mr. Gennaro could perform other work in the economy was based on a wrong legal standard and not supported by substantial evidence." [Opening Brief, Statement of Errors, docket #13 at 1-2]

## VII. ANALYSIS

The Court will analyze each of Plaintiff's issues in turn.

## A.   Did the ALJ Improperly "Pick and Choose" from the Evidence?

Plaintiff argues that the ALJ improperly chose to adopt some, but not all of the findings of the consultative physician when he gave substantial weight to the physician's findings but rejected evidence of the carrying and bending restrictions that were favorable to the Plaintiff's claim. Plaintiff asserts that the ALJ's finding that the physician's opinions indicated a "greater sustained

capacity" than Plaintiff's testimony is incorrect.  Plaintiff asks that the Court[1] remand "with orders

to consider Mr. Gennaro's residual functioning capacity with the admission of the bending

restriction found by the consultative expert."

Defendant counters that, even if true that the ALJ rejected the bending restriction for his

RFC, the vocational expert testified at hearing that an individual with Plaintiff's age, background

and experience could perform other jobs in the national economy with the ALJ's restrictions listed

in the RFC *and* the bending restriction set by the consultative physician.   Although provided the

opportunity to do so, the Plaintiff did not file a reply brief.

It is improper for an ALJ to "pick and choose through an uncontradicted medical opinion,

taking only the parts that are favorable to a finding of nondisability."  *Chapo v. Astrue*, 682 F.3d

1285, 1292 (10th Cir. 2012).  Moreover, "[a]n ALJ's rejection of a medical opinion based on an

incorrect reading of the record is grounds for remand."  *Sedlak v. Colvin*, No. 11-cv-01247-PAB,

2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing  *Mercer v. Colvin*, No. 12-CV-35-FHM,

2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013)).

For this issue, the Court agrees with the Defendant.  Here, Dr. Wright, the consultative

physician, opined that Plaintiff should be restricted to bending no more than three times per hour.

However, the ALJ did not include any restriction for "bending" in the RFC, which he found was not

supported by the record as a whole. [AR 27, 33]  As such, after learning of the ALJ's proposed RFC

presented to the vocational expert at the hearing, and hearing the expert's testimony that Plaintiff

---

[1]Plaintiff's actual request is addressed to the "Appeals Council," but based upon the
content of the brief, the Court construes such address as a typographical error.

could perform two of his previous jobs under such RFC, Plaintiff's counsel then asked the expert, "if the individual were limited to bending at the waist no more than three times per hour, would that affect your answer to the second hypothetical?" [AR 81] The expert replied that both jobs would be precluded, but determined that with the bending restriction added to the RFC, the individual could perform the jobs of "order clerk, food and beverage," "call-out operator," and "charge account clerk." [*Id.*] The ALJ found at Step 5 that Plaintiff could perform these jobs, which "exist in significant numbers in the national economy" and determined Plaintiff was "not disabled." [AR 33-34] Accordingly, had the ALJ included the bending restriction in his RFC, he still would have made the non-disability determination at Step 5.

The Court concludes that even if the ALJ erred in rejecting the bending restriction set by Dr. Wright, the error was harmless and, thus, denies Plaintiff's request to remand the ALJ's decision on this issue. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (where the ALJ's RFC was generally consistent with the physician's findings and there was no reason to believe a further analysis or weighing of the opinion could advance the disability claim, the alleged error was harmless).

**B.      Did the ALJ Sufficiently Consider Plaintiff's Depression, Pain, Obesity and the Side Effects of Diabetes Treatment?**

"When a claimant has one or more severe impairments the Social Security [Act] requires the [Commissioner] to consider the combined effects of the impairments in making a disability determination." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)). However, the mere existence of a severe impairment or combination of impairments

does not require a finding that an individual is disabled within the meaning of the Act. To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months. *See Kelley v. Chater*, 62 F.3d 335, 338 (10th Cir. 1995). When formulating the RFC, an ALJ is required to consider all of a claimant's impairments, both those that are severe and those that are not. 20 C.F.R. § 404.1545(1)(2).

In this case, the ALJ found that Plaintiff had the residual functional capacity to perform "a range of light work as defined in 20 CFR 404.1567(b) with the following limitations: the claimant must avoid climbing ladders and scaffolding; the claimant can lift and carry 10 pounds frequently and 20 pounds occasionally; the claimant is able to sit for at least one hour at a time and up to four hours during an eight-hour workday; the claimant can stand for at least 30 minutes at a time and up to four hours during an eight-hour workday; the claimant can walk for at least 30 minutes at a time and up to four hours during an eight-hour workday; and the claimant can occasionally stoop, kneel and crouch." [AR 27] In making this finding, the ALJ considered whether Plaintiff's medically determinable impairments produced his alleged symptoms and evaluated the intensity, persistence and limiting effects of such symptoms. [*Id.*]

A residual functional capacity ("RFC") assessment is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities." SSR 96-8p, 1996 WL 374184 at *2. It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'" *Id.* "[T]here is no

requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

Plaintiff contends that the ALJ erred in failing to consider Plaintiff's "medically documented interwoven pain and depression, and diabetes treatment requiring multiple bathroom breaks throughout the day." He also argues that the "ALJ did not consider Mr. Gennaro's obesity" when he "essentially adopted" the RFC of the consultative examiner who failed to consider Plaintiff's obesity at all.

Defendant counters that the Plaintiff effectively challenges the ALJ's credibility findings, specifically concerning his pain and his medication's side effects. Defendant argues that the ALJ's credibility findings regarding Plaintiff's statements of pain were supported by the inconsistencies in Plaintiff's statements and the medical records. As for Plaintiff's obesity, the Defendant notes that Plaintiff never claimed obesity as a disability nor testified that his obesity limited his ability to work, and Plaintiff failed to cite to evidence showing that his obesity limited his ability to perform the sedentary jobs identified by the ALJ.

The Court finds first that the ALJ committed no error in assessing the RFC with respect to Plaintiff's depression. The ALJ properly considered the medical evidence concerning the condition, which was minimal (Plaintiff sought no mental health treatment and told the SSA that he believed his primary disabilities stemmed from physical conditions, not mental [AR 332]), and thoroughly discussed the four functional areas for evaluating mental disorders. [AR 25-26] The ALJ further acknowledged that this preliminary discussion was not sufficiently detailed for RFC analysis and

asserted that his RFC assessment "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." [AR 26] Thereafter, the ALJ engaged in a detailed analysis of Plaintiff's depression, considering not only Plaintiff's testimony, but also his mother's affidavit, Plaintiff's completed Function Report and the medical evidence. [AR 28-29] In addition, the Court finds no error because the Plaintiff fails to identify which portion(s) of the RFC lack restrictions for his alleged functional limitations from depression.  *See Miller v. Astrue*, 496 F. App'x 853, 859-60 (10th Cir. 2012) (ALJ did not err when he did not include limitations for an impairment he found to be severe at step two when that limitation was not "borne out by the evidentiary record.").

With respect to Plaintiff's pain, the ALJ similarly discussed the record at length, considering Plaintiff's testimony (including his admission that he has a "high pain threshold") , the documentary evidence and Plaintiff's reports to his physicians. [AR 29-30] The ALJ noted that Plaintiff's chosen forms of pain relief were "conservative" and "minimal" demonstrating treatment that would not suggest a severe disability.  [AR 29]  *See Alarid v. Colvin*, -- F. App'x --, 2014 WL 6602441, at *3-*4 (10th Cir. Nov. 21, 2014) ("the ALJ's conclusion that Mr. Alarid's treatment was 'essentially routine and/or conservative in nature, consisting only of medications and injections,' was supported by substantial evidence"); *see also Dixon v. Colvin*, 556 F. App'x 681, 683 (10th Cir. 2014) (same).

As for the side effects from Plaintiff's medication – namely, diarrhea, which causes Plaintiff to need frequent restroom breaks – the ALJ noted this limitation and referred to Plaintiff's last employment position as a Parts Sales Manager at Autozone at which the Plaintiff testified he frequently took restroom breaks. [AR 30]  The ALJ concluded that Plaintiff's own testimony belied any notion that frequent breaks limited his ability to perform the job, because Plaintiff testified he

was fired when he allegedly did not follow company policy regarding a customer transaction, not as a result of his impairments. [*Id.*]

Finally, the Court finds the ALJ sufficiently considered Plaintiff's obesity in the RFC assessment, particularly noting the evidence from the medical records. The ALJ found "the medical source opinions have included the effects of the claimant's obesity in the limitations provided." [AR 32] Plaintiff argues, however, that the consultative examiner, Dr. Wright, "did not identify obesity as one of Plaintiff's diagnoses" and, thus, the ALJ's adoption of Dr. Wright's physical restrictions was in error. The Court disagrees.

First, the ALJ noted that "[t]here is no medical opinion which specifies any impact of the claimant's obesity on the other impairments"; thus, he acknowledged that none of the physicians specifically diagnosed obesity nor noted any limitations from it. [AR 32] Second, while Dr. Wright did not diagnose Plaintiff as "obese" (nor did any of Plaintiff's physicians) and did not characterize Plaintiff as "obese," he noted Plaintiff's height and weight and described Plaintiff as "well developed" and "well nourished." [AR 418] *See Chrisco v. Astrue*, No. 12-1144-RDR, 2013 WL 872400, at *4 n.2 (D. Kan. Mar. 8, 2013) (the court found a physician likely considered the claimant's body mass in his examination when he described her as "well nourished" and "well developed," but did not use the term, "obese"). The Court concludes the ALJ's finding that the Plaintiff's obesity "was considered by the medical sources discussed above [including Dr. Wright]" is supported by substantial evidence. Moreover, as there is no medical evidence in the record indicating the Plaintiff's obesity had restricted his ability to work, it would be improper for the ALJ to speculate as to the impact Plaintiff's obesity may have on his other impairments. *See Fagan v.*

26

*Astrue*, 231 F. App'x 835, 837-38 (10th Cir. 2007) (citing SSR 02-01p).

The Court concludes that the ALJ's credibility findings as to Plaintiff's statements regarding his pain, depression, medication side effects and obesity are supported by substantial evidence and the Court will not remand the case on this issue.

**C.     Did the ALJ Err in Determining that the Plaintiff Could Perform Other Work in the Economy?**

Plaintiff's entire argument on this issue is stated in one sentence: "Here[,] the ALJ's conclusion that Mr. Genanaro could perform his past work as a salesperson and an inspector was based on testimony from a vocational expert, who was relying on a hypothetical, which did not include 'with precision' all of Mr. Gennaro's impairments."[2]  Opening Brief, docket #13 at 24-25. Plaintiff cites an Eighth Circuit opinion for the proposition that "testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."  *Id.* (citing *Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990)).[3]  However, in that case, the court found that the ALJ did not have the

_____

[2]This argument is not only substantively vague (as discussed herein), it is also confusing; the argument appears to challenge Step 4 of the analysis while the issue itself, as stated, appears to challenge Step 5.

[3]Plaintiff also cites a Tenth Circuit case, *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).  Opening Brief, docket #13 at 25.  In that case, after listing an ALJ's duties at Steps 4 and 5 of a disability analysis (none of which includes "stating with precision" all of a claimant's impairments in a hypothetical question), the court proceeds to analyze the role of the Dictionary of Occupational Titles in eliciting evidence from a vocational expert at Step 5 and holds "the ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert"s testimony as substantial evidence to support a determination of nondisability."  *Haddock*, 196 F. 3d at 1091.  Plaintiff fails to relate the holdings of this opinion to the present issue, and the Court finds no relation.

complete report of vocational rehabilitation experts until after the hearing and, thus, improperly relied on the testimony of the vocational consultant who testified at the hearing based upon a hypothetical question that did not include all of the vocational rehabilitation experts' findings. *Id.* at 721-22. Conversely, in this case, there is no argument nor indication that the ALJ failed to include information missing from the record in his hypothetical to Mr. Tisdale. Moreover, the Court has found that all conclusions/findings reached by the ALJ in this case and challenged by the Plaintiff are supported by substantial evidence. The Court will not speculate as to what the Plaintiff means by this challenge to the ALJ's findings at Step 4 and/or 5. Accordingly, without more from the Plaintiff as to what he believes was "missing" from the hypothetical, including which particular impairments, the Court must deny Plaintiff's request to remand on this issue.

## CONCLUSION

In sum, the Court concludes that the ALJ's error (if any) in rejecting Dr. Wright's bending restriction was harmless; his findings and considerations of Plaintiff's depression, pain, obesity and medication side effects were supported by substantial evidence; and his analyses at Steps 4 and 5 were sound. The Court finds the final decision is supported by substantial evidence in the record as a whole and the correct legal standards were applied. Therefore, the decision of the ALJ that Plaintiff Carmen Gennaro was not disabled is AFFIRMED.

Dated at Denver, Colorado this 2nd day of February, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge